## VAN AUKEN v. CUMMINGS.
### Patent Appeal No. 2690.

Court of Customs and Patent Appeals.
April 22, 1931.

Walter H. Pumphrey, of New York City (John B. Brady, of Washington, D. C., of counsel), for appellant.

Harry E. Seidel, of Washington, D. C., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office in an interference proceeding. Said decision awarded priority of invention to appellee, reversing the decision of the Examiner of Interferences, who awarded priority of invention to appellant's assignor, hereinafter called the appellant.

The invention relates to a gauge for indicating the volume of gasoline in the fuel tank of an automobile. The issue is stated in three counts, which read as follows:

"1. In apparatus of the class described, a liquid holding tank, means forming an inclosed chamber, a connection for creating a partial vacuum in said chamber, means affording communication between said chamber and the liquid in said tank at the minimum level to be gaged whereby the liquid may be drawn into said chamber by the vacuum existing therein, a valve for regulating the degree of vacuum in said chamber, and means responsive to the rise of liquid in said chamber for controlling said valve.

"2. A liquid gage including a tank, a float chamber above the liquid level in the tank, a liquid conduit having its lower end submerged in the liquid in the tank and its other end in communication with the float chamber and providing a constant communication therebetween, a vacuum connection whereby a condition of low pressure may be set up in the chamber, causing flow of liquid from the tank through the conduit and into the float chamber, a float in the chamber means actuated in accordance with the position of the float for regulating pressure within the float chamber, and means controlled by the float chamber pressure for indicating the liquid level in the tank, substantially as described.

"3. An apparatus for indicating the height of liquid in a tank, comprising the combination, with a tank adapted to contain liquid, of a chamber smaller in horizontal area than the tank and extending upward and downward throughout the range of levels to be indicated, said chamber having a liquid connection with said tank at a low level relatively to said range of levels, a vacuum connection whereby a condition of low pressure may be set up in the chamber, means controlled by rise of liquid in said chamber for limiting the degree of vacuum possible to be obtained therein, an indicator operable by difference between internal and external fluid pressures, and means whereby said indicator is coupled with that part of said chamber in which a vacuum is thus produced."

Appellant filed his application on October 30, 1919, and the application of appellee was filed on March 22, 1922. Appellant is, therefore, the senior party, and the burden was upon appellee to establish priority of invention by a preponderance of evidence.

Appellant took no testimony, and he is accordingly restricted to his filing date for conception and reduction to practice.

Appellee took testimony, and established that on March 22, 1919, he filed an application in the Patent Office, which application disclosed the invention embodied in the counts here in issue. On December 6, 1920, the Primary Examiner held said application was abandoned on the ground that no full responsive amendment had been made within the period of one year from the office action of April 25, 1919.

Both tribunals of the Patent Office held that appellee was entitled to the filing date of his first application, March 22, 1919, for conception of the invention, but that such filing did not constitute a reduction to practice. No error is assigned upon the ruling giving appellee said date of March 22, 1919, for conception of the invention.

There are two questions before us for determination:

(1) Did appellee reduce the invention to practice prior to appellant's filing date?

(2) If the first question be determined in the negative, was appellee diligent in reducing the invention to practice at the time of appellant's filing date, and thereafter until he reduced to practice?

With regard to the first question, there is no corroboration of appellee's testimony that the invention was successfully operated by him prior to appellant's filing date, October 30, 1919.

The Board of Appeals found that the evidence established that the invention was successfully tested by appellee at least as early as June, 1920, that he was entitled to this date for reduction to practice, and that appellee was chargeable with diligence from just prior to October 30, 1919, appellant's filing date, to June, 1920.

As to appellee having reduced the invention to practice as early as June, 1920, this depends upon whether or not appellee's testimony to that effect was corroborated by the witnesses McEwen and appellee's brother.

The witness McEwen testified that appellee disclosed to him a gasoline gauge for automobiles in the early part of 1919; that "it was essentially a hydrostatic principle rather than a mechanical one, and for the balancing of pressure and making indications of pressure"; that he saw parts of the apparatus in the laboratory; that he saw the complete invention in use on a car and saw it work at various times throughout the year 1920; that the "visible part consisted of two glass tubes, exposed glass tubes, that were part of the manometer, contained liquid, partly filled with liquid."

With regard to the operation of the device, the witness testified as follows:

"* * * There were two manometer tubes, two glass tubes I suppose, one at a certain level, corresponding to the mark made, and then after a certain amount of gasoline had been used the liquid in the other tube would disappear and then return. There was a periodic pulsation corresponding to certain changes of level so that you could watch it, and, in fact, I did watch that, indicating that the level had changed by a certain amount since the previous tripping of the valve. *During the time that I made these observations I noted that the device was in the process of development.*" (Italics ours.)

He further testified as follows:

"Q. During this period covered by process of development, do you recall Mr. Cummings having experienced any material difficulty with some part or another? A. Yes; there was leakage, I recall particularly, and the float would stick at times, and that float was in process of further development."

With regard to the devices constructed by appellee and placed by him upon his car, appellee testified that: "I used them on my own car for experimental purposes and to find out all I could about the best way in which to construct them."

Appellee's brother testified that in June, 1920, he visited appellee, who drove him about in his car, in which appellee had installed his device; that the only part of the device that he saw was as it appeared on the instrument board, a calibrated glass tube with the liquid rising or falling with the fluctuation of the amount of gasoline in the tank; that appellee, however, explained the principle of the device to him by means of a rough drawing. The witness further testified that, in addition to seeing appellee in June, 1920, he saw him in December, 1920, in the fall of 1921, and in the early spring of 1922, that upon all of these occasions the witness discussed the invention with appellee, and that appellee stated to him that he

had not been able to fully perfect the invention because of the condition of his health.

There is no testimony that either McEwen or appellee's brother ever examined the quantity of gasoline in the tank to determine whether the device did, in fact, register even approximately the amount of gasoline therein. Both evidently assumed that the fluctuations of the liquid in the glass tubes indicated the fluctuations in the amount of gasoline in the tank, but, in view of the testimony of McEwen that there was leakage and that the float would stick at times, we do not think that such assumption is proper.

Appellee himself admitted that there was occasionally trouble caused by leakage and also with the float used in the device. The more serious trouble seems to have been with the float, and this was so serious that it caused appellee temporarily to abandon a material part of the invention embodied in the counts in issue, viz. the automatic principle of having the liquid itself become the means of regulating the vacuum.

In appellee's letter to his patent attorneys under date of January 15, 1921, which is in evidence, he said:

"* * * I have, however, found some difficulty in getting positive operation of the float in opening and closing the ports. Whether the difficulty could be remedied or not by better mechanical work than I have yet been able to procure I do not know, but I have decided, at least for the time being, to abandon the automatic principle, and to open and close the ports by hand, as may be required."

He then explains in the letter his new idea, which, if carried to completion, would, it seems to us, have been a different invention than that here in issue, though having some common elements. He further states in the letter: "I have almost completed a model according to this new principle and believe I shall have determined its practicability within the next two weeks. * * *"

Appellee testified that he experimented for several months in attempting to perfect this idea, but that he finally determined to go back to the idea of having the liquid itself become the means of regulating the vacuum, as embodied in the counts here in issue, and he finally devised the hinge type of float set out in his application filed on March 22, 1922.

We feel compelled to conclude from the evidence produced that appellee has not established by a preponderance of evidence a reduction to practice of the invention in issue prior to his filing date of March 22, 1922. This conclusion is strengthened by the fact that, although his 1919 application was pending at the date of his claimed reduction to practice, he nevertheless failed to prosecute said application, and it therefore became abandoned; the application here involved being filed on March 22, 1922.

While it is true that reduction to practice does not require a device embodying the invention to be mechanically perfect, or a commercial success, its practical efficacy and utility must be demonstrated. Burson v. Vogel, 29 App. D. C. 388.

The purpose of the device here in question was to indicate upon the dashboard of an automobile, at least approximately, the amount of gasoline in the tank. In order to constitute a reduction to practice, the evidence must show that it was demonstrated that the device was operative for this purpose. Leakage or lack of operativeness of the float might well be destructive of the utility of the device. Apparently the improvement of the float used by appellee to secure the desired result was not merely a matter of mechanical skill because, according to appellee's testimony, he worked for a period of two years upon this problem, and for a period of several months abandoned it entirely, and endeavored to perfect another device of a similar nature, but which was not automatic in operation. However this may be, it appears that the operation of the float in his experimental device presented such difficulty that he completely abandoned the device here involved for several months. This, to us, is very significant, and strongly indicates that the experimental device did not operate in such a way as to constitute a reduction to practice.

Having held that there was no reduction to practice of the invention established by appellee prior to March 22, 1922, the next question is whether appellee was diligent in reducing the invention to practice from immediately prior to October 30, 1919, appellant's filing date, to March 22, 1922, appellee's filing date.

Appellee testified that his eyes were injured in 1918 in war work at the Edgewood Arsenal, Md.; that such disability continued during the entire period in question, and greatly increased in the early summer of 1919 to the fall of 1924, although there were intervals in which he could use them more than at other times; that it was necessary for him to continue work at the Scripps Institution in order to make a living, and for that

reason he was unable to apply himself to perfecting the invention in issue for commercial use to the extent that he would have but for such disability. He testified as follows:

"*  *  * I could work slowly and in the course of several months could get as much done as I might ordinarily do in a very few weeks, of the type of work which did not pertain directly to my livelihood."

He also testified to a disability of dysentery which was cured in September, 1922.

His testimony with regard to his eye disability was corroborated by the witness McEwen and by appellee's brother, and we think it is established that such disability prevented him from proceeding as rapidly in perfecting the invention as he otherwise would have been able to do. We cannot, however, hold that he was diligent in reducing his invention to practice from immediately prior to October 19, 1919, to March 22, 1922, his filing date, a period of two and one-half years, especially in view of his own testimony that for a period of several months he abandoned the particular device responding to the counts here involved, and devoted himself to experiments with a device that required the opening and closing of the ports by hand, and did not have the automatic principle of having the liquid itself become the means of regulating the vacuum.

In the case of Lotterhand v. Hanson, 23 App. D. C. 372, it was held that:

"*  *  * To delay one invention for the sake of another projected invention to be used in connection with it, and which may never be realized, cannot in patent law be construed as an exercise of due diligence."

▮ We are of the opinion that the decision of the Examiner of Interferences, awarding priority of invention to appellant, was correct, and the decision of the Board of Appeals is reversed.

Reversed.