**ELECTRO METALLURGICAL CO. et al.**
**v. KRUPP NIROSTA CO., Inc.**

No. 1254.

District Court, D. Delaware.

May 15, 1940.

L. A. Watson and D. A. Woodcock (of Watson, Bristol, Johnson & Leavenworth), both of New York City, and Hugh M. Morris, of Wilmington, Del., for plaintiffs.

Hans v. Briesen and Fritz v. Briesen, (of Briesen & Schrenk), both of New York City, and Southerland, Berl, Potter & Leahy, of Wilmington, Del., for defendants.

NIELDS, District Judge.

This is a suit in equity under section 4915, U.S.R.S., as amended, 35 U.S.C.A. § 63, for a decree that Electro Metallurgical Company, plaintiff, is entitled "to receive a patent" for the invention specified in claims 1, 2 and 9 of the patent awarded to Schafmeister, defendant's assignor.

Paul Schafmeister originally was a codefendant. He filed a disclaimer in this court and the bill of complaint was dismissed as to him.

Plaintiff, Electro Metallurgical Company, is the owner of patent application serial No. 593,928 filed by plaintiffs Frederick M. Becket and Russell Franks on February 18, 1932. Defendant, Krupp Nirosta Co., Inc., is a Delaware corporation and is owner of application serial No. 550,288 filed by Paul Schafmeister on July 11, 1931. In the oath accompanying his application reference is made to the fact that a corresponding German application had been filed on July 21, 1930.

Interference was declared in the United States Patent Office between the above applications and resulted in a decision by the Examiner of Interferences thereafter affirmed by the Board of Appeals awarding priority of invention to Schafmeister and refusing to award priority of invention to Becket and Franks. Plaintiffs did not appeal from the decision to the Court of Customs and Patent Appeals but on March 8, 1938, brought this suit.

## State of the Art

Both patent office tribunals adopted the following as an appropriate description of the state of the art:

"The common invention here in controversy relates to the prevention of 'intergranular corrosion' in austenitic chromium nickel steels. When ordinary austenitic chromium nickel steels of the 'stainless' varieties are heated to within a range of temperatures between 400° C. and 900° C. (the exact temperatures depending upon the composition of the steel) they lose their resistance to corrosive media, and such media attack the steels in a peculiar manner: The attack is most rapid along the boundaries of the individual crystalline grains of the metal. The heating may occur, for example, during welding, annealing, or use in heated chemical apparatus, and the corrosion may be so severe that the steel disintegrates to a powder. The severity of the attack in ordinary austenitic chromium nickel steels depends upon a number of factors: some compositions are less resistant than others, and for any given composition there is a characteristic range of temperatures which produces severe damage more readily than other temperatures. The loss of corrosion resistance also depends on the time of heating at the damaging temperatures, and the amount of attack depends also on the nature of the corrosive agent and the length of time it has been in contact with the metal.

"Each of the interfering applications discloses the discovery that the alloyed addition of columbium, or tantalum, or mixtures of columbium or tantalum, to austenitic chromium nickel steels of the 'stainless' type inhibits the above-described loss of corrosion resistance of the steels upon prolonged holding at temperatures in the neighborhood of 500° C."

The problem to which both parties addressed themselves was the prevention of this "intergranular corrosion". Thus the invention in issue relates to a known austenitic granular nickel steel alloy. This alloy is substantially proof against surface corrosion. However, it is not proof against intergranular corrosion, if the alloy has first been subjected to a certain range of temperatures (deleterious range of 500° to 900° C.) and is simultaneously, or thereafter, exposed to a corrosive treatment. The alloy is known as "18–8" steel because it contains about 18% of chromium and 8% of nickel. Intergranular corrosion attacks the boundaries of the metal grains, thus weakening the alloy and causing leakage. The express purpose of the invention of the parties is to prevent this intergranular corrosion.

## Counts in Issue

The interference involved 10 counts but plaintiffs brought this suit with respect only to counts 1, 2 and 9. These counts read as follows:

"1. A corrosion-resisting steel containing about 18% chromium, about 8% nickel, .07% to .2% carbon and from 0.3% to 2.5% of an additional material acting to lessen materially loss of corrosion resistance on prolonged holding at 500° C., the balance substantially all iron, said additional material consisting substantially all of columbium.

"2. A corrosion-resisting steel containing about 12% to 30% chromium, about 7% to 25% nickel, about 0.07% to 0.2% carbon, and from 0.3% to 2.5% of an additional material acting to lessen materially loss of corrosion resistance on prolonged holding at 500° C., the balance substantially all iron, said additional material consisting substantially all of columbium."

"9. A metal article which in its normal use is subjected to active corrosive influences while the metal in at least part

of the article is in a condition resulting from heating at ranges within the carbide precipitation range (approximately 500° to 800° C.) without subsequent heating at substantially higher temperatures, said article being resistant to said corrosive influences and composed of a corrosion-resisting austenitic steel, the iron of which is substantially all in the gamma form, containing about 12% to 30% chromium, about 7% to 25% nickel, about 0.07% to 0.2% carbon, and from 0.3% to 2.5% of an additional material consisting substantially all of columbium and tantalum, the balance substantially all iron."

## The Invention

The alloy of the 18–8 type is known as a "noble" metal. It resists surface corrosion and is popularly known as stainless steel. Dr. Benno Strauss of Krupp's at Essen, Germany, invented this austenitic 18–8 corrosion resisting steel about 1912. It was soon discovered that when steel was welded at the welding temperatures of 500° C. to 800° C. and the steel so welded was brought in contact with acids it corroded and eventually disintegrated. This occurred in breweries, in apparatus used in refining gasoline and in many other commercial uses. Here was a problem of the first water. Dr. Strauss again came to the fore and announced at a meeting of scientists in Brussels in 1928 that the presence of carbon in the steel was the cause of the corrosion. He suggested that the carbon content be reduced to less than .07%. However, this process proved costly and difficult.

Working with Strauss at Krupp's were Dr. Houdremont and Dr. Schafmeister. They tackled the problem in another way. They suggested that the metal titanium be added to the melt to counteract the carbon, producing a titanium carbide. By this procedure the trouble maker was eliminated. Becket and Franks learned of this treatment in America and started their staff of chemists to work. In plaintiff's "Table F" appended to plaintiff's brief is a corrosion test on the steel containing titanium at high temperatures showing that they were following the teaching of the German metallurgists. The titanium invention was made in 1929 and was embodied in a patent application introduced as evidence in this case.

In the following year of 1930 Schafmeister filed a German application "of a patent of addition" to the titanium patent setting forth metals other than titanium for the purpose of neutralizing the carbon. He did not repeat the statements in the earlier patent but gave two specific examples as to what he found useful consisting of tantalum, columbium and zirconium. In the German application, in evidence in this case, Schafmeister says, after referring to Strauss and Houdremont:

"Extensive experiments have now shown that it is not only the type of chrome nickel steel alloys having a stable surface which either have a carbon content of less than about 0.07% or contain, for example, titanium, and/or vanadium which have the advantage that they do not lose their resistance to corrosive agents and do not become brittle when in manufacture or use they are exposed to temperatures comparable to drawing treatments of about 500° to 900° C., but that this advantage is also inherent in chrome nickel steel alloys having a stable surface which contain one or more of the elements niobium, tantalum, zirconium, uranium, hafnium or rare earth metals such as cerium, thorium, lanthanum, yttrium, neodymium, samarium, etc. These elements also, as has been proven, form such a stable chemical combination with the carbon in solution in the austenitic base mass that the chemical and mechanical stability of the alloy is not affected for practical purposes after a heat treatment of about 500° to 900° C. In these cases, as in the case of titanium and vanadium, it is also advantageous to establish such a relation of the stated alloy components with respect to the carbon that practically the entire amount of carbon is bound to the added alloy components. Tests with two chrome nickel steel alloys having a stable surface and containing respectively about 0.17% carbon, 8% nickel, 18% chromium, 1.3% tantalum plus niobium, and 0.12% carbon, 8% nickel, 18% chromium, and 0.3% zirconium show that such alloys still preserve their resistance to corrosive attack and do not become brittle when they have experienced heating to about 500° to 900° C.

"It is especially advantageous to use as the added alloy component one or both of the elements niobium and tantalum, since these elements not only combine

with the carbon in a manner which does not deleteriously affect the chemical and mechanical stability of the alloy but they furthermore result in particularly good welding conditions. The loss due to burning off of the elements niobium and tantalum during welding is only very small and in fact smaller than that of the other elements enumerated. These latter elements, however, do likewise not burn off to an extent so as to affect the chemical stability of the alloys during or after a heating to about 500 to 900° C."

On the basis of the above application and its corresponding American application the patent office tribunals all decided that Schafmeister was entitled to the date of his German application, i. e., July 21, 1930.

In 1931, Schafmeister filed the following additional applications throughout Europe: Application filed in Canada, July 21, 1931, patent issued August 1, 1933, No. 334,525; application filed in Austria, July 10, 1931, serial No. A. 5279-31, patent granted February 15, 1934 and issued as No. 141727; application filed in Great Britain, July 15, 1931, patent accepted January 16, 1933 and issued as No. 386,690; application filed in France, July 15, 1931, patent granted and issued February 15, 1932, as No. 720008; application filed in Sweden, July 11, 1931, serial No. 2904/1931; application filed in Czecho-Slovakia, July 11, 1931, serial No. 5375–31.

### Becket and Franks

Frederick M. Becket is vice-president of Electro Metallurgical Company and Russell Franks is one of its metallurgists. The company is a wholly owned subsidiary of Union Carbon & Carbide Corporation. It has a fully equipped laboratory in Long Island City, New York, employing about forty metallurgists or chemists and some sixty others. During the period under consideration Becket and Franks were afforded the fullest laboratory facilities.

Becket and Franks claim to have done something before July 21, 1930, the Schafmeister date, although they did not file an application until almost two years later. Early in 1929 Becket and Franks conferred about the problem of overcoming intergranular corrosion. May 23, 1929, Becket directed Franks "to make additions of our Ta–Cb alloys to 18 Cr– 8 Ni Steels and test for effects on long time holding at high temperatures. If good try Cb alloys only". There is no evidence that the direction of the vice-president was heeded until four months later. Franks testified about two leaves from the calendar pad of the laboratory. One, dated September 27, contains the following: "Intercrystalline Strauss work, why not add tungsten, molybdenum, copper, titanium, etc., for improvement. Aluminum may help. Try most alloys in outside building including tungsten, zirconium, columbium, tantalum, cerium". The other leaf from the pad read: "Columbium-tantalum alloy to intercrystalline corrosion".

Following these instructions to try many and various things, Becket and Franks tried Heat A–722 as appears on the experiment sheet:

Intergranular corrosion tests on A–722

| Holding Treatment | Date of Test | Results of Tests in Boiling Acidified Copper Sulphate Solution |
|---|---|---|
| 2 weeks at 475° C | 10/30/29 | Unaffected in 2–3/4 hours |
| 2 weeks at 550° C | " | Disintegrating in 95 min., dead after 15 min. |
| 2 " " 650° C | " | " " " " " " " " |
| 2 " " 750° C | " | Unaffected in 2–3/4 hours |
| 2 " " 850° C | " | " " " " |
| 2 " " 400° C | 12/19/29 | " " 3 " |
| 2 " " 300° C | 2/18/30 | " " 2–1/2 " |
| 4 " " 400° C | 7/1/30 | Unaffected |
| 4 " " 475° C | " | " |

Becket and Franks had no idea what the result would be. They were simply experimenting. They did not know whether aluminum would help, or tungsten, or molybdenum, or any of the other elements. The five tests of October 30, 1929, at the temperatures on the above experiment sheet show how soon the metal disintegrated. The tests shown spelled failure.

There were two analyses of A–722, one by a chemist named Hamner in 1929 and the other by a chemist named Price in 1932. Hamner testified in the patent office that he made his analysis in October, 1929, and reported "Ta probably 0.19 and Cb probably 0.16". Price testified that on May 27, 1932, he analyzed Heat A–722, and produced a sheet from his notebook showing .44% Columbium and .06% tantalum. Hamner was available as a witness but was not called upon to explain his incorrect analysis.

Moreover Becket and Franks made weekly and monthly reports on what went on. The monthly progress report of November 9 declares: "Several low carbon alloys of the 18% chromium and 8% nickel type were made and small amounts of * * * columbium and tantalum were added". If during this period they had made a discovery amounting to invention their reports would certainly have reflected it.

The few desultory tests yielded nothing satisfactory. Becket and Franks turned their attention to two other experiments. (1) They dropped chromium nickel because the experiments were barren. They substituted "chromium manganese", which is foreign to the inquiry at hand. (2) They tried "heat stabilization", which involved a preliminary heat treatment at 750° C. for a couple of days before exposure to the testing temperatures. They developed this theory and published a paper about it. Throughout the year 1930 no other heat was made except the one in which manganese replaced the nickel.

In October, 1929, and for a long time thereafter Becket and Franks were merely experimenting with some one or more of a large number of metals which, added to the chromium nickel steel, would render it immune to intergranular corrosion. Until they had succeeded in adding enough columbium they had not even conceived an invention. In Heat A–722 they believed they had columbium and tantalum in about equal proportions.

There is no testimony as to any analysis of Heat A–722, except the Hamner analysis, at any time before the filing of the Becket and Franks application on February 18, 1932. About three months after their application had been filed, they were engaged in preparing a paper respecting their alloy. At that time they began to have "some doubts" as to the correctness of the Hamner analysis. Thereupon they directed that another analysis be made by the chemist, Price. May 27, 1932, the new analysis showed that instead of .16% columbium there was present .44%, and instead of .19% tantalum there was present .06%. Here was a revelation of the true condition but the discovery was far too late.

■ There can not be a reduction to practice unless the inventor knows what he is doing. Until the inventor knows what he has done so that he can duplicate the production and teach the public how to duplicate it, there can be no reduction to practice. Becket and Franks believed they were testing a steel containing about equal amounts of columbium and tantalum. In 1929, they did not know how much columbium and tantalum had gone into Heat A–722. They did not have this knowledge until May, 1932.

■ If Becket and Franks are to prevail as prior inventors they must show, either that they had successfully·reduced their invention to practice before the filing date of Schafmeister's German application, i. e., July 21, 1930, or that they had conceived the invention before that date, and thereafter coupled their conception to reduction to practice by diligent efforts. In fact, they did not know what they were doing.

■ Whether or not Becket and Franks believed in October, 1929, that they had solved their problem must be decided not from their testimony ten years after the event but from their actions and memoranda at the time or shortly thereafter. The long delay in applying for a patent tends strongly to show that the alleged reduction to practice was nothing more than an unsatisfactory or abandoned experiment. It is equally true that loss of interest in an invention for a long time proves that an

alleged earlier reduction to practice was unsatisfactory. If Becket and Franks had been satisfied that they were on the right track, they certainly would have made additional samples until they got an alloy which could be recommended to manufacturers, or was sufficiently valuable to protect by a patent application.

No heat was made with columbium plus tantalum after October, 1929, until April, 1931, when Heat B–72 was made. Thus for one and one-half years after Heat A–722 had been made, Becket and Franks did not make another heat with the necessary ingredients. Moreover there was complete silence with respect to the alleged invention in Franks' weekly progress letters until the letter of March 10, 1931.

### Findings of Fact

The court makes the following findings of fact:

1. Schafmeister's German application, serial No. 18b K. 144.30, was filed in Germany on July 21, 1930. Schafmeister's application, serial No. 550,288, was filed in the United States Patent Office July 11, 1931. The German application and the United States application both disclose the inventions in issue in counts 1, 2 and 9.

2. Becket and Franks had no conception of the inventions of the counts in issue until the latter part of 1931, at which time they first made a heat with the addition material "substantially of columbium" which resisted intergranular corrosion.

3. Becket and Franks did not reduce to practice alloys proving resistant to intergranular corrosion within the range of carbon and the range of columbium specified in counts 1 and 2 and never reduced to practice a metal article which would prove resistant to intergranular corrosion within the ranges of carbon and columbium and tantalum specified in count 9.

4. Becket and Franks did not successfully reduce to practice until after July 11, 1931.

5. Becket and Franks were not diligent in reducing to practice until after July 11, 1931.

### Conclusions of Law

The court makes the following conclusions of law:

1. The plaintiffs have not sustained the burden resting upon them of proving that the tribunals of the patent office were in error in awarding priority of invention to Paul Schafmeister.

2. The United States application of Paul Schafmeister, serial No. 55,288, has the same force and effect as if filed July 21, 1930, the date of the filing of the corresponding German application.

3. The filing of the application of Paul Schafmeister, serial No. 550,288, constitutes a reduction to practice of the counts in issue by Schafmeister on July 21, 1930.

4. Plaintiffs have not proved conception of the invention specified in the counts in issue before July 21, 1930.

5. Plaintiffs have not proved that Becket and Franks successfully reduced to practice the invention specified in issue before July 21, 1930.

6. Plaintiffs have not proved that Becket and Franks were diligent in reducing to practice the invention specified in counts 1, 2 and 9 in issue.

7. Schafmeister is the first inventor of the invention specified in the counts in issue and his assignee, defendant herein, is entitled to receive a patent thereon.

The bill of complaint must be dismissed.