37 C.C.P.A.(Patents)

**KONET et al. v. HASKINS et al.**

Patent Appeal No. 5636.

United States Court of Customs
and Patent Appeals.

Feb. 2, 1950.

C. J. Kalman and Stephen Cerstvik, Bendix, N. J., for appellants.

Herbert H. Thompson, Brooklyn, N. Y., for appellees.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Associate Judges.

JOHNSON, Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority of invention to the party Haskins upon two counts of an interference declared between Haskins and Kellogg's joint application for patent, Serial No. 512,266, filed November 29, 1943, for "Gyro Instrument," which was later converted to the sole application of Haskins, and an application of the parties Konet and Noxon, Serial No. 569,747, filed December 26, 1944, for "Attitude Indicator."

No question is raised here as to the counts of the interference reading upon both disclosures.

A conventional attitude gyro for aircraft, when passing through gimbal lock, reverses quite rapidly 180° about its spin axis and this is said to be undesirable because of the unnatural stresses imposed on the gyro bearings subjecting the bearings to excessive wear.

The subject matter of the interference is a gyroscopic attitude indicator for aircraft for eliminating gimbal lock by adding a power driven third gimbal to maintain a predetermined relation between one of the axis of suspension and the rotor spin axis, thus preventing gimbal lock and the resulting unnatural stresses and excessive wear on the bearings.

. Appellants being the junior parties, the burden was upon them to establish priority of invention by a preponderance of the evidence.

The counts at issue read as follows:

"1. A gyro instrument having a casing, a main gimbal mounted therein, an auxiliary gimbal mounted on said main gimbal for movement about an axis perpendicular to the axis of the main gimbal, a gyro rotor case pivotally mounted on said auxiliary gimbal for movement about an axis perpendicular to the axis of the auxiliary gimbal, pick-off means for detecting tilt of the case about its axes relative to the auxiliary gimbal, and means responsive to said pick-off means for moving said main gimbal in a direction that restores the auxiliary gimbal to a tilt-free condition relative to the case.

"2. A gyro vertical having a rotor case, a universal support for the rotor case including a main gimbal and an auxiliary gimbal mounted on said main gimbal for movement about an axis perpendicular to the axis of the main gimbal, said case being pivotally mounted on the auxiliary gimbal on an axis that is normally coincident with the axis of the main gimbal, a normally ineffective, two part, electrical pick-off, one of whose parts is positioned by the rotor case and the other of whose parts is located on the auxiliary gimbal, and serve motive means operable to move said main gimbal about its axis responsive to the output of said pick-off upon tilt of the rotor case about its axis relative to the auxiliary gimbal."

The counts originated as claims in the Haskins and Kellogg joint application. Both parties filed preliminary statements, took testimony, filed briefs, and were represented at final hearings. The Sperry Gyroscope Company, Inc. is the assignee of the Haskins and Kellogg application, whereas the Bendix Aviation Corporation is the assignee of the Konet and Noxon application.

Appellees alleged that conception of the invention was made in the six month period prior to and including February 1, 1942, and that it was disclosed to others dur-

ing the same period. Appellants alleged conception of the invention on or about October 22, 1942, disclosure to others on or about the same date, and actual reduction to practice sometime in March of 1943.

The board correctly held that the evidence established that Haskins conceived the invention "at least as early as May 24, 1942"; that he is entitled to November 29, 1943, the filing date of the application, as his date of constructive reduction to practice of the invention in issue; and that the evidence established conception of the invention by appellants "by November 2, 1942." The board also held that the evidence failed to show an actual reduction to practice by appellants, that appellants were entitled only to a constructive reduction to practice as of their filing date, December 26, 1944, and that appellants were not diligent in reducing the invention to practice from immediately prior to the entry of Haskins into the field, viz., November 29, 1943, to December 26, 1944, appellants' filing date. For these reasons, priority of invention upon the counts in issue was awarded to appellees.

From that decision of the board, appellants have taken this appeal. Before us, appellants make the following contentions:

1. That the board erred in holding that appellants did not make an actual reduction to practice in the summer of 1943:

2. That the board erred in holding that appellants have not established the exercise of reasonable diligence towards reducing their invention to practice during the period beginning just prior to November 29, 1943, the Haskins and Kellogg filing date, and ending December 26, 1944, the filing date of the appellants;

3. That the board erred in granting the motion of Haskins and Kellogg to convert their joint application to a sole application of Haskins;

4. That the board erred in not restricting the party Haskins to the filing date of his sole application when it granted the party Haskins and Kellogg's motion to convert from a joint to a sole application.

Appellants contend that following conception of the invention of the counts in issue they exercised diligence of the highest degree. The record shows a "request for project" dated November 2, 1942, and that it was approved about November 12, 1942; that an assembly drawing was completed on November 25, 1942; that materials were procured, the project assigned to the experimental machine shop for construction of the necessary parts to make the instrument here involved, and that it was completed about May of 1943; that it was subjected to laboratory tests by appellant Konet extending beyond March of 1943. The record shows that during the laboratory tests a problem of arcing and burning of the take-off contacts occurred, and that between August and October 1943 a relay was installed and various transformers tried out.

Appellants' witness Reichel testified that the instrument was tested in the laboratory; that "It was running for several days, operating"; that the results were encouraging, "except that the sliding contacts were burning, and something had to be done to eliminate the burning of the contacts"; that "A relay was introduced between the contacts and the motor to cut down the current in the take-off contacts"; and that the instrument was flight-tested by Commander Holt after the relay was introduced.

Appellant Konet testified as follows:

"XQ. 262. What is this electro-magnet marked with a red 'S' on Exhibit 6?

"A. The electrical equipment associated with this exhibit has no bearing on the present discussion. It was introduced after the completion of the material that I have testified to. * * * I am trying to cover my ignorance: but it is a part of the amplifier circuit which drives the motor—I can say it that way, and not say anything, anyhow. I did not mean to be impertinent by my answer.

XQ. 263. What else has been added to this exhibit since the flight test, beside the tubes and this electro-magnet?

"A. The condensers, the resistor, and the wiring of those parts. Originally, it

had only the motor, the gear train, and the gyro."

It is apparent that the laboratory tests did not constitute a successful reduction to practice.

Commander Holt testified that he flight-tested appellants' Exhibit 6, "or one similar to" it, sometime during July, August, or September of 1943, and it is upon this flight-test that appellants rely to establish a successful reduction to practice of the instrument here involved.

Commander Holt's testimony concerning his knowledge of the instrument involved and facts as to the flight-test and its results was given more than three years after the test flight and was wholly from memory. Holt was a Lieutenant Commander in the United States Navy during 1943 and was interested in the development of attitude gyros. He testified that he first saw the instrument here involved about three months before he went to England (he left for England on May 24, 1943, and returned to the United States on June 26, 1943) and that he could not state definitely, but was "quite sure that the model was completed and actually running in the laboratory" before he left; that he had seen it in the "Bendix labs," in the drafting room; and that "it was one of the things we were comparing with some of the English developments. Mr. Meredith Smith in England was developing something along the same line. I remember comparing the three developments, because we had already flight-tested the Sperry attitude gyro at that time"; and that he was familiar with the operation of the instrument and the operation of the power-operated gimbal. He did not, however, testify as to what was in the instrument. He further testified as follows:

"Q. 19. Commander, you previously testified that you had seen the instrument known as the attitude gyro worked on by Messrs. Konet and Noxon, prior to your trip to England. Could you tell us how soon, or at what time before your trip you saw this instrument?

"A. I cannot state definitely; but I am quite sure that the model was complet-ed and actually running in the laboratory before I left: and I imagine from my knowledge of how fast or how long it took to make and design things, that it was probably about three months before I left that I first saw it.

"Q. 20. Did you have occasion to examine the instrument after your return from England, in June of 1943?

"A. Yes.

"Q. 21. After that instrument, known as the attitude gyro, was flight-tested?

"A. Yes. I personally flight-tested it."

Holt was not asked nor did he testify as to whether or not he *did* make an examination of the attitude gyro. Having had "occasion to examine" the instrument does not establish that he actually examined it. He was not asked, nor did he testify as to what examination he made, if any examination in fact was made; whether it was a thorough or just a casual examination, or what the result of the examination was. He testified that he flight-tested appellants' Exhibit 6 (the instrument here involved) "or one similar" to it; that he "put it through loops, wingovers, Immelmens, rolls on top of a loop, cartwheels, split S's, spins"; that "it was a very, very hot day" and that the plane "had quite a bad cockpit" and that he made himself "quite sick"; that the principal reason for flight-testing the instrument was to test the motor-driven third gimbal; and that the purpose of the power-driven third gimbal is to prevent a possible reversal through gimbal lock.

Holt testified concerning the meaning of gimbal lock, as follows:

"XQ. 51. What do you mean by going through gimbal lock?

"A. That is very hard to explain, if you do not have a model. Perhaps I can show you, with this model here, if I can hold this one up.

"As you go through the vertical the axis of the gyro is lined with the axis of the outer gimbal: as it reaches that point, the gyro will flip 180° and then continue on in the opposite direction. The indication of the reading is not disturbed, but

the gyro rotates about the outer gimbal axis through 180°, and is called a gimbal lock."

He further testified that when he returned the instrument to Bendix, "I told them the results of the flight-test: that it worked perfectly satisfactorily; and that I had not been able to tumble it." Also, "* * * as far as I was concerned it worked—it did exactly what it was supposed to do." Holt's testimony was that a reversal takes place "very quickly" and that unless he was watching when it happened, he could not tell that it occurred. However, he also testified as follows:

"R.R.D. 149. But you are positive that you observed that there was no gimbal lock while you were flight-testing it?

"A. I can't say positively that there was no gimbal lock, * * *."

He was alone on the flight test and he made no written report. That he was not certain as to the details of construction of the instrument he flight-tested is shown by his testimony as follows:

"Q. 40. Do you know whether the instrument that you flight-tested had those vacuum tubes in it?

"A. I do not think so. As I remember, we had trouble with contact and a relay, and I think the vacuum tubes were used later to replace the relay, as I remember it.

"Q. 41. So that the instrument that you flight-tested had a relay rather than vacuum tubes?

"A. I think so. I am not positive on that point."

Later he testified that there was trouble with the contacts on the relay and that "it was a mechanical feature that was not good and it would be probable cause of trouble under long service conditions, and, also, it did cause some trouble in the radio * * * the arcing in it did cause noise in the radio"; also, that he did not take the instrument he flight-tested apart before he flight-tested it. There is no testimony that he took the instrument apart after he flight-tested it. Holt was not positive that appellants' Exhibit 6 is the same gyro that he flight-tested. He stated that it is either Exhibit 6 or "it is the same type of gyro." That Commander Holt was somewhat uncertain as to his memory is further shown by his testimony as follows:

"XQ. 84. Didn't you inform Bendix of this contact trouble, and they changed it as a result of your information?

"A. No. I think they had already come to the conclusion that the contact system was not right and we just went ahead and tested it anyway, because the instrument was working at the time; we felt it would be a source of trouble over any period of time, but rather than wait for the change I think we went ahead and flight-tested it. I am not sure about that, though."

█ We have carefully examined all of Commander Holt's testimony and we think it is too indefinite, both as to the parts of the instrument, their relationship inside the instrument, and as to just how such parts were functioning, to constitute satisfactory proof of reduction to practice. Fausek et al. v. Vincent, 92 F.2d 909, 25 C.C.P.A., Patents, 770; Miessner et al. v. Hoschke et al., 76 App.D.C. 343, 131 F.2d 865; Shafer v. Cooper, 153 F.2d 116, 33 C.C.P.A., Patents, 803. A witness's conclusions alone, based upon memory and unsupported by any other evidence as to the test and its results, are not sufficient to establish successful reduction to practice. Sneed v. McConkey, 76 F.2d 422, 22 C.C.P.A., Patents, 1151; Borchardt Co. v. Bukolt, 94 F.2d 983, 25 C.C.P.A., Patents, 944; Electro Metallurgical Co. et al. v. Krupp Nirosta Co. Inc., D.C.Del.1940, 33 F.Supp. 324; Chicago Raw Hide Manufacturing Co. v. National Motor Bearing Company, D.C.N.D.Calif., 1943, 50 F.Supp. 458.

Appellants' witness Dornheim, the only person shown by the record who actually performed any work on the instrument after the flight-test, testified that "We changed the slip ring and the gimbal frame because we had excessive sparking, at that time: that was what they found out by flying it, that it was getting too hot; * * *." Also, "Oh, they complained about the indicator, the different marking; we changed that, here. Also we had to change the

calibration of the gyro, too." Further, "I know we changed the transformer, because that was heating up, too: we had to make a different winding in it." Dornheim testified that the instrument was taken out for test after these changes were made, but there is no evidence in the record of an actual test having been made, or of any results. Although the instrument was sent to Wright Field after Commander Holt's flight test, it does not appear that it was tested there, the instrument being returned to Bendix because of dissatisfaction at Wright Field with the radium paint used in the instrument. After it was returned from Wright Field, a vacuum tube system was substituted for the relays so as to avoid the "burning of the sliding contacts."

Work on the instrument here involved was completed and the project marked closed on October 31, 1943, although Dornheim testified that about a year later he replaced the mechanical relay with vacuum tubes. The record does not show any other activity until the filing of appellants' application for a patent on December 26, 1944.

In its decision the board stated:

"There apparently was an 'urgent need' for such a device * * *. After the changes in the device following the initial flight test had been made by Dornheim, the device was naturally sent to Wright Field, where it stayed for awhile * * *. However, it was never flown there, and the type of device subsequently purchased by the government did not have a servomotor and its control contacts * * *.

"After the device was returned from Wright Field, the vacuum tube system was substituted for the relays * * *. According to Reichel, this substitution was made to avoid the 'burning' of the sliding contacts * * *. Dornheim states that it then was again taken out for test * * * but no testimony is given as to the results.

"It is believed evident from the above account that a satisfactory solution of the control system for the power operated gimbal had not been reached before the vacuum tube arrangement had been incorporated into the device; and since, there is no evidence of a satisfactory test thereafter, we hold that Konet and Noxon have not established an actual reduction to practice prior to December 26, 1944, their filing date."

■ On the record before us, we cannot say that the board committed error in so holding.

■ Appellants contend that defects of the character encountered during the flight-test of the involved instrument did not negative an actual reduction to practice and in support of that contention cite Pierson v. Beck, 40 F.2d 769, 17 C.C.P.A., Patents, 1210; and Van Auken v. Cummings, 49 F. 2d 490, 18 C.C.P.A., Patents, 1250. In Pierson v. Beck, supra, the court approved the principle that "To constitute a reduction to practice it is not necessary that the device be perfect or a commercial success." [40 F.2d 770]. In Van Auken v. Cummings, supra, the court reiterated the law as stated in the Pierson v. Beck case, and then added [49 F.2d 492], "its practical efficacy and utility must be demonstrated." We do not think the flight test in the instant case demonstrated the instrument's practical efficacy and utility.

Appellants cite Koch v. Greibach, 96 F. 2d 843, 25 C.C.P.A., Patents, 1168, in support of their contention that the testimony of "Chupak, Konet, Noxon and Dornheim as well as Reichel, by association of entirely different occurrences peculiar to each, fixed the time and the occasion of the flight-testing of the instrument in issue in the summer of 1943 so that Commander Holt's testimony *regarding the flight-test is thoroughly substantiated* and should be accepted as establishing the reduction to practice in the summer of 1943." [Emphasis supplied.] We agree that the above mentioned testimony is sufficient to establish the time and the occasion of the flight-test, but it falls far short of establishing a successful reduction to practice. Holt made the flight-test *alone*. None of the above witnesses even saw the flight-test. All they could possibly know is what Holt told them about it.

Appellants cite Leichsenring v. Freeman, 103 F.2d 378, 26 C.C.P.A., Patents, 1153, as a parallel holding to their contention that Exhibit 6 "worked precisely as intended throughout the entire period of the flight-test to conclusively demonstrate that the application of such principle solved the gimbal lock problem." The test failed to demonstrate that the involved instrument solved the problem. Commander Holt testified "I can't say positively that there was no gimbal lock"; that there was "trouble with contact and a relay"; and that "it was a mechanical feature that was not good and it would be probable cause of trouble under long service conditions, and, also, it did cause some trouble in the radio—I remember that part of it: the arcing in it caused noise in the radio." Other evidence presented by appellant shows that "We changed the slip ring and the gimbal frame because we had excessive sparking, at that time: that was what they found out by flying it, that it was getting too hot; * * *." Also, "they complained about the indicator, the different marking: we changed that here. Also we had to change the calibration of the gyro, too." Further, "I know we changed the transformer, because that was heating up, too: we had to make a different winding in it."

In its decision, the board said:

"However, the advantage of the present device over the simpler two gimbal Sperry attitude gyro was the avoidance of reversal through gimbal lock * * *. Since the only problem with gimbal lock was the excessive wear due to the sudden reversals * * * which in time shorten the life of an instrument * * * it would appear that a test to show the utility of the more complicated device should not disclose defects that 'would be probable cause of trouble under long service conditions', as stated above, or which 'would be the source of trouble over any period of time' * * *. Such defects would indicate the possibility that the life of the tested device would be as short as that of the earlier device, with no advantage to justify the addition of the complicated parts * * *."

■ We agree with that holding of the board.

■ Appellants' second contention could only prevail if they had exercised reasonable diligence towards reducing the invention to practice during the period beginning just prior to November 29, 1943, the Haskins and Kellogg filing date, and ending December 26, 1944, the filing date of appellants. Appellants do not contend that any attempt was made toward an actual reduction to practice of the instrument except the flight-test made by Commander Holt in July, August, or September of 1943. The record does not disclose any activity by the appellants after the flight-test other than making the changes in the instrument as above mentioned, and those charges were made previous to October 31, 1943, at which time the project was marked "Completed," except that the witness Dornheim testified that about a year "later" (later than September 1943) vacuum tubes were installed to replace the mechanical relay. That is not sufficient to establish the exercise of reasonable diligence during the critical period.

■ The record discloses that during the taking of testimony, while appellee Haskins was testifying, it developed for the first time that the invention in issue was the sole invention of Haskins. Counsel for Haskins immediately gave notice that "In view of this testimony and in case such testimony is borne out later by Mr. Kellogg, the joint application of Haskins and Kellogg involved in this interference will be converted into the sole application of Robert Haskins, in accordance with the practice approved in Briggs et al. v. Kaisling, 311 O.G., p. 3, and other cases following this, including the case of Sperry and Thompson vs. Brown vs. Thompson, Interference 52,660, MSS Decision dated February 4, 1928, and cases referred to in the Journal of Patent Office Society, August 1945, p. 546." The testimony of Haskins that he was the sole inventor was borne out by Kellogg who filed a disclaimer. On May 29, 1947, which was before the time for taking testimony set by the examiner had elapsed, appellees moved to amend the joint application of Haskins and Kellogg so as to convert it into a sole application of Haskins. In its decision the board said: "we

believe that Haskins is a sole inventor of the subject matter in issue, and that the circumstances show no lack of good faith" and "We accordingly hold that there was no lack of reasonable diligence in seeking to convert the application to a sole application, and that there was no lack of good faith in this matter." The board sustained the motion to convert the joint application to a sole application of Haskins. We are in agreement with that holding of the board. In re Roberts, 49 App.D.C. 250, 263 F. 646; Briggs et al. v. Kaisling, 53 App.D.C. 49, 288 F. 254; Crane v. Grier et al., 71 F.2d 180, 21 C.C.P.A., Patents, 1163.

The joint application having been converted to a sole application of Haskins under circumstances which show there was no lack of diligence in seeking to convert the application to a sole application and no lack of good faith in the matter, it follows that Haskins is entitled to the date of the filing of the joint application as his date of constructive reduction to practice.

In its decision, the board stated:

"In view of the above holdings, it is evident that Konet and Noxon can not overcome the effect of the senior party's filing date unless they prove that they were continuously exercising reasonable diligence towards reducing the invention to practice during the period beginning just prior to November 29, 1943, and ending December 26, 1944. They have utterly failed to establish such a case of diligence. Work on the 'project' ended in October, 1943 * * * and there is thus no definite evidence that Konet and Noxon were exercising diligence at the time the senior party's application was filed * * *. The brief references to the subsequent history of the device, such as those by Noxon * * * and Dornheim * * * are insufficient to establish continuous activity over the period of some thirteen months preceding the filing of the Konet and Noxon application. Diligence has not been established relative to the preparation and filing of the application * * *. It is accordingly held that Konet and Noxon have not established the necessary diligence in reducing the invention to practice for them

to overcome the effect of the senior party's filing date." ·

On the record before us, we cannot say that the board committed error in so holding.

For the reasons stated, the decision of the Board of Interference Examiners awarding priority of invention to Robert Haskins, Jr. on the subject matter in issue, is affirmed.

Affirmed.

Because of illness, HATFIELD, J., was not present at the argument of this case and he did not participate in the decision.