The STANLEY WORKS, Plaintiff,

v.

McKINNEY MANUFACTURING
COMPANY, Defendant.

Civ. A. No. 79–567.

United States District Court,
D. Delaware.

Aug. 27, 1981.

William Prickett and Michael Hanrahan, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for plaintiff; Frank W. Ford, Jr., and Richard S. Clark, Brumbaugh, Graves, Donohue & Raymond, New York City, of counsel.

Henry E. Gallagher, Jr., Connolly, Bove & Lodge, Wilmington, Del., for defendant; Gordon D. Coplein and Joseph Lerch, Darby & Darby, P. C., New York City, of counsel.

OPINION

MURRAY M. SCHWARTZ, District Judge.

This is an action for patent infringement under 35 U.S.C. § 271. Defendant denies infringement and counterclaims for a judgment declaring the patent invalid under 35 U.S.C. §§ 102(a) and (b), and 103. The Court has jurisdiction by virtue of 28 U.S.C. § 1338. Finding that the litigated claims of

the patented invention were obvious under section 103, the Court holds those claims invalid.

## BACKGROUND

### A. The Devices

Plaintiff, The Stanley Works ("Stanley"), owns United States Patent No. 3,806,852 (the "Suska patent") (PX1)[1] for a "switch activating hinge," some of the claims of which are the subject of this lawsuit.[2] The device monitors the opening and closing of doors to indicate the presence of intruders. The presence of a security device remains unknown to those intruders, because it is hidden and protected by the door's familiar hardware.[3] As embodied in Stanley's commercial product, the invention comprises a standard door hinge (in a range of sizes) with a magnet attached by a casing to the back of one hinge leaf, and a "reed

second position when the magnetic field produced by the magnet at the switch reaches the predetermined strength, and the switch reassumes the first position whenever the magnetic field produced by the magnet at the switch is less than the predetermined strength.

8. A hinge according to claim 1, wherein the magnet is selectively movable relative to the first hinge leaf, to permit selective adjustment of the predetermined position of the leaves.

9. A hinge according to claim 8, further comprising a cylindrical casing extending from a rear surface of the first hinge leaf and adapted threadedly to receive the magnet, whereby the magnet can assume a selectively adjustable position axially within the casing.

10. A hinge according to claim 9, further comprising a housing encircling the magnet and having a threaded exterior surface, a filament of deformable material positioned by a ridge formed axially on an interior surface of the casing and engaged by threads of the housing, the filament being dimensioned to prevent axial sliding movement of the housing within the casing and being deformed by the threads of the housing to permit screw-like combined rotation and axial translational movement of the housing within the casing.

11. A hinge according to claim 9, further comprising a housing encircling the magnet and having a threaded exterior surface and wherein the casing has a threaded interior surface, the threaded exterior surface of the housing and the threaded interior surface of the casing cooperating to permit screw-like combined rotation and axial translational movement of the housing within the casing.

In its complaint, Stanley charged McKinney with infringing claims 1, 2, 6, 7, 8, 9 and 11. McKinney asserted that these same claims were not infringed, invalid, and unenforceable.

---

1. See Trial Transcript at A26–36 for a description of the device by Charles R. Suska, its inventor. Hereinafter, the trial transcript will be referenced as "Tr. at ____." Plaintiff's exhibits will be referred to as "PX____"; defendant's as "DX____." The parties submitted several exhibits that duplicate each other. For convenience, plaintiff's exhibits are referenced in such instances.

2. The language of the Suska patent claims read as follows:

1. A switch activating hinge comprising a pair of adjacent, pivotally connected hinge leaves, a magnet producing a magnetic field mounted on a first hinge leaf, and a magnetically activated switch responsive to the magnet mounted on a second hinge leaf, the switch responding to the magnet when the first hinge leaf is oriented in a predetermined position relative to the second hinge leaf.

2. A hinge according to claim 1, wherein front surfaces of the hinge leaves are oriented in generally face-to-face relation when in the predetermined position.

3. A hinge according to claim 1, further comprising casings adapted to receive the magnet and the switch, each casing being closed at one end and being inserted into an opening formed in a hinge leaf, whereby the casing extends from a rear surface of the hinge leaf and the one end of the casing generally defines a continuous plane with a front surface of the hinge leaf.

4. A hinge according to claim 3, wherein one end of a casing in the first hinge leaf is in registration with one end of a casing in the second hinge leaf when the front surfaces of the hinge leaves are oriented in generally face-to-face relation.

5. A hinge according to claim 3, where the one end of each casing is fabricated of a non-magnetic material.

6. A hinge according to claim 1, wherein the first hinge leaf is mounted on a door and the second hinge leaf is mounted on a jamb.

7. A hinge according to claim 1, wherein the switch assumes a constant first position relative to permitting a flow of current therethrough when the magnetic field produced by the magnet at the switch is less than a predetermined strength, the switch assuming a

3. Defendant McKinney argues that Stanley may not rely on invisibility to distinguish its invention from other devices because the concealment feature is not specifically cited in the patent claims. This issue will be addressed *infra* at 1109–1110.

switch"[4] in a similar casing attached to the back of the other hinge leaf. (PX42a–c). When the hinge leaves and their respective casings are attached to the door and door jamb, the magnet and its casing lies within an aperture within the door, while the reed switch and its casing project into the door jamb and are connected to an electrical wiring system. As the door opens or closes, the hinge leaves pivot apart or together, moving the magnet away from or closer to the reed switch. Reacting to the magnet's changed proximity, the switch's filaments open or close to break or connect an electrical circuit. Any change in that circuit can be registered, for example, on a light panel or alarm system. Thus, a guard learns that the door has been opened or closed.

The accused device, a magnetic monitoring hinge, produced by McKinney Manufacturing Co. ("McKinney"), does not differ from Stanley's hinge once it is installed; the elements appear and function as described above. Tr. at B193 (Gwozdz) (*see* PX33). McKinney's monitor is sold, however, in separate parts: hinge, magnet in metal casing, and reed switch in plastic casing.[5] (PX27). In the field, magnet and reed switch in their casings are force fitted into mortise holes in the door and jamb. The McKinney hinge is then mounted on the door and door jamb so that circular recesses in the backs of the hinge leaves receive the flat ends of the cylindrical casings embedded in the door and door jamb. (PX28) Both Stanley and McKinney monitoring devices are completely concealed by the hinge leaves. As a consequence, in theory, an unauthorized intruder cannot disarm a monitoring device of whose existence he cannot be aware as a prelude to accomplishment of an unauthorized, undetected entry.

### B. *File History of the Patent*

On October 2, 1972, Charles R. Suska, then Stanley's Manager of Product Engineering and Research, filed an application for a patent covering his switch activating hinge. (PX2). The patent examiner rejected the application on the ground of overbroad language. Suska's original claim 1 described "a magnet producing a magnetic field *associated with* a first hinge leaf, and a magnetically activated switch responsive to the magnet *associated with* a second hinge leaf," (PX2 at 11) (emphasis supplied). Reasoning that the phrase "associated with" could encompass prior art in which a magnet and reed switch were used anywhere on a door hung by hinges, the examiner rejected the application. He observed, *inter alia*, that the claims would be allowed if there were a substitution of more precise terms for "associated," suggesting "mounted on" or "mounted to." (PX2 at 16). Thereafter, Suska refined his invention. Consequently, he abandoned the prior application (PX3 at 32) and submitted a continuation-in-part application adopting the phrase "mounted on" in the disputed claims. (PX3 at 16). The claims proving acceptable (PX3 at 26–27), the Suska patent issued April 23, 1974.

During the pendency of the patent application, Stanley continued to work toward

---

4. *See* PX43 and Tr. at A31–33 (Suska). A reed switch is a common electrical connector composed of an envelope containing metal reeds whose ends, when joined, complete an electrical circuit. The reeds react to magnetic force so that the ends move together or apart depending on the proximity of the magnet. The switch may be designed to maintain the reed ends either in a normally closed or in a normally parted position. The switch may also respond to the magnet by the movement of one reed back and forth between two different electrical endings so that, instead of opening or closing one circuit, each movement closes one circuit and opens another. For purposes of this suit, these distinctions make no difference. The essential feature is the change of the reeds' positions at the approach or removal of the magnet.

5. This difference is crucial to defendant's noninfringement case. The patent claims a monopoly of devices in which reed switch and magnet are "mounted on" hinge leaves. McKinney argues that "mounted on" must be strictly interpreted to require the one-piece structure of Stanley's embodiment, thus excluding the three-part accused device from the patent's coverage. (PX1, Col. 7 at lines 14–21).

marketing the new product.[6] By fall, 1972, advertising brochures had been prepared. (PX16, 17). In 1973, a few sales were made and in the following years, the "concealed switch hinge" or "CS" feature became part of Stanley's stock in trade. (*See* PX44).[7] McKinney developed its magnetic monitoring hinge and put it on the market in late 1977 or early 1978. (Tr. at B182 (Gwozdz)). On October 28, 1977, Joseph W. Gwozdz, a McKinney employee, applied for a patent on the McKinney device. Patent No. 4,148,001 was granted on April 3, 1979. (PX31). On December 4, 1979, Stanley filed this action. After a four-day bench trial on the merits, post-trial briefing and oral argument, the case is ready for decision. This opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

## VALIDITY

McKinney charges the Suska patent is invalid on the grounds it was anticipated under 35 U.S.C. § 102, and obvious under 35 U.S.C. § 103.[8] In order to assess these grounds of invalidity the Court will discuss seriatim: a) the date of invention, b) the scope and content of the prior art, c) the merits of the charge of anticipation under 35 U.S.C. § 102 and d) the merits of obviousness as a basis for invalidity under 35 U.S.C. § 103 with particular emphasis upon: 1) identifying the pertinent art, 2) ascertaining the ordinary level of skill in that art and 3) examining whether the differences between the claims of the Suska patent and the prior art are such that the subject matter as a whole would have been obvious on the date of invention to one with ordinary skill in the art.

### A. Date of Invention

As a threshold factual determination preliminary to assessing the anticipation and obviousness defenses, the Court must determine the date of invention. Under statutory patent law, the date of invention may be as late as the date of filing of the patent application, in this case, October 2, 1972. (PX2). However, recognizing that the creative and experimental processes must occur prior to that date, Congress left room in the statutory scheme for proof of an earlier date of invention.[9] To succeed in claiming the earlier date, the inventor bears the relatively heavy burden of proving when his invention was "reduced to practice." Successful reduction to practice occurs, in the case of a mechanical device, when the machine has been constructed that embodies the invention claimed by the patent, and that machine has been shown to be suitable for its intended purpose. *De-Long Corp. v. Raymond International, Inc.*, 622 F.2d 1135, 1143 (3d Cir. 1980); *Grefco, Inc. v. Kewanee Industries, Inc.*, 499 F.Supp. 844, 848 (D.Del.1980), *aff'd mem.* (3d Cir. 1981); *Rexroth v. Gunther*, 205 U.S.P.Q. 666, 672 (Bd.Pat.Int.1979). *Cf. Brenner v. Manson*, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966). The prototype claimed as a reduction to practice need not

---

**6.** A more precise date for reduction to practice is discussed *infra* at 6–7.

**7.** PX44 is a list showing sales of Stanley's CS (concealed switch) hinges from 1972 through 1980. While the Court agreed with defendant's objection that, as to precise figures, Suska's qualifications to prepare such a document are somewhat inadequate, the document's general reliability as an indication of business done seems fairly well established. *See* Tr. at A56–62 (Suska).

**8.** McKinney also charged that Stanley should not be permitted to enforce its patent because of alleged fraud on the patent office. There was no record support for this charge. *See* discussion *infra*, n. 22.

**9.** The two possible dates of invention—patent application and reduction to practice—are part of the statutory definition of conditions of patentability:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States,

35 U.S.C. § 102.

be ready for full-scale commercialization and further experimentation will not bar a finding of reduction to practice. *DeLong, supra,* 622 F.2d at 1143; *Rexroth, supra,* 205 U.S.P.Q. at 672. Nevertheless, the fact-finder must be convinced that the prototype offered was "reliable and useful." *Bell Telephone Laboratories, Inc. v. Hughes Aircraft Co.,* 422 F.Supp. 372, 380 (D.Del.1976), aff'd, 564 F.2d 654 (3d Cir. 1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978); *Accord DeLong, supra; Van Aucken v. Cummings,* 49 F.2d 490, 492 (C.C.P.A.1931); *Grefco, supra,* 499 F.Supp. at 848.

Stanley argues that reduction to practice occurred not later than December, 1971. (*See* PX4). In support of this date, plaintiff offers the testimony of Charles R. Suska that by the end of 1971 he had completed and tested[10] a model of the concealed switch hinge. (Tr. at A36–42 (Suska)). The prototype in question, PX5, was not the first built by Suska; it was the one regarded as a "functional unit. It was doing the job we expected it to do." (Tr. at A42 (Suska)). Similar models were sent to Stanley's five regional sales offices in late December, 1971 to early January 11, 1972. Tr. at A37–38 (Suska). Stanley's correspondence shows these sales efforts bore fruit in the form of a January 11, 1972 meeting with a prospective purchaser interested in the concealed switch hinge among other Stanley products. (PX4, PX9). The documentary evidence of public promotion of the new product lends considerable support to Suska's claim that his invention had been reduced to a successful model by the end of 1971. The record as it stands is judged sufficient to accredit Suska's testimony.[11] *See Bell Telephone Laboratories, Inc. v. Hughes Aircraft Co.,* 564 F.2d 654, 657 (3d Cir. 1977); *Bennett v. Serota,* 477 F.2d 1385, 1390–91 (C.C.P.A.1973). Accordingly, I find December 30, 1971 as the date of reduction to practice of Stanley's concealed switch hinge as disclosed in claims 1, 2, 6, 7, 8, 9 and 11 of Patent No. 3,806,852. Having determined the date of reduction to practice, attention is now turned to the scope and content of the prior art.

**B.** *Scope and Content of the Prior Art*

Pre-1972 door-monitoring devices fall into two major categories: the mechanically activated and the magnetically activated.[12] In the first category is a door-monitoring hinge disclosed in U.S. Patent No. 3,715,537 (the "Peterson patent"), filed on August 27, 1971. (PX19). As in Suska, one hinge leaf supports an electrical switch and the other carries an adjustable contact. Protruding from the hinge on the switch side is a plunger which contacts the activating device on the other hinge leaf when the door is closed. That contact sets off an alarm or

---

10. McKinney argues that the device cannot have been reduced to practice in December, 1971 since the primary tests seem not to have involved placing the device on a door. The short answer is that in-service testing was not necessary. *See* Tr. at A133 (Suska); *Sinko Tool & Mfg. Co. v. Automatic Devices Corp.,* 157 F.2d 974, 977 (2d Cir. 1946); *Bell Telephone, supra,* 422 F.Supp. at 380 (*dictum*). Moreover, credible testimony indicates the concealed switch hinge was successfully tested on a door. Tr. at B46 (Suska).

11. Defendant has argued that internal Stanley documents of spring and summer, 1972 prevent the finding that Suska's invention was complete before July of that year. The documents, notably PX11–14 and DX NNN, indicate that Stanley continued to search for and experiment with suitable magnets and switches for the commercial product. One memorandum of May, 1972 expressly states that "the CS is not

a fact yet." (DX NNN). The Court accepts Suska's explanation that the memo, addressed to a salesman, meant not that the invention was not a fact, but that production was not yet under way. Hence, commercial orders could not be filled. Tr. at B53–56. That the problem was one of commercialization and not of invention is indicated by Stanley's readiness to offer the product for commercial sales only a few months later. *See* PX16 (advertising circular dated October, 1972).

12. McKinney has submitted as an example of the "state of the art," U.S. Patent No. 3,710,369 (PX25) filed by Toshio Takahashi on December 2, 1970. The Takahashi patent discloses a sliding window or door assembly in which the reed switch and magnets are embedded in the framework and sliding elements of the structure to obtain a security system monitoring the opening of the door or window. This patent is not offered as invalidating prior art.

other signal. (PX26, lower hinge). The drawback to this device is that the protruding contact and plunger are visible to the would be burglar who has the opportunity to visit the site prior to an unauthorized entry.

In the category of magnetic switches, two door-monitors were offered as prior art in which a magnet is associated with the door, with the reed switch placed on or in the jamb so that it faces the magnet when the door is closed. One such device, exemplified by U.S. Patent No. 3,668,579 (the "Harman patent," PX22) applied for on November 9, 1970, involved special housings for magnet and reed switch that could be located at the top of the door or on its latch side. (PX26, uppermost grey device). There is no attempt at concealment.[13] A second device, the Detex door switch (PX23, PX26 (upper plates on both side and top)), locates the magnet and reed switch behind flat metal plates embedded opposite each other in door and jamb either at the top of the door or on its latch side. Depending on the distance between door and jamb, the plates may be raised slightly from, recessed into, or placed flush with, the surface. (See PX23). They may also be painted the color of the door and jamb to further the concealment objective. (Tr. at B98 (Griebe)).[14]

Defendant has offered another form of magnet and reed switch combination alleged to belong to the relevant prior art.

These are "float switches" designed to regulate the level of liquid in a container. (DX PPP). In a float switch, the magnet and reed switch are located in joined containers with the free-floating magnet container rotating pivotally with respect to the fixed reed switch. As the liquid rises, the magnet floats up toward the switch to trigger it and engage a pumping mechanism or stop the flow of liquid. Illustrative of float switches as prior art are United Kingdom Patent No. 1,172,127 ("the U.K. patent") (PX20) and U.S. Patent No. 3,471,665 ("the Sargent patent") (PX21), both applied for in the late 1960's. Unlike Peterson, Harman and Detex which are found to be prior art to Suska, float switches are not prior art because they are used in technology unrelated to building security, *viz.*, monitoring fluid levels.[15]

McKinney also asserts prior art status for a device described in the deposition testimony of Irving Saphirstein of Locknetics and illustrated in defendant's model exhibit, DX LL. The device employs facing plates on the hinge side of the door. Electrical connector parts emerge from the inner faces of the plates; when they touch, power is transferred to lock or unlock the door. Mr. Saphirstein testified that he had created a version of this device in which a magnet and reed switch were mounted behind the plates and connected to the circuitry of the power transfer system so that it could also function as a monitoring device. It is con-

13. The Harman device was described in the patent application (PX1, Col. 1 at lines 17–26) and cited by the examiner in his rejection of the original, broadly phrased claims. (PX2 at 16). The significance of these citations is discussed *infra* at 18.

14. Plaintiff stipulated (Tr. at B205) that Detex was "known or used" prior to the date of invention, December 30, 1971. PX23, the Detex instruction sheet, bears a copyright date of 1970. At deposition, Mr. Kolbe of Detex testified that the device was produced in 1970 and sold in 1970 or 1971. (Tr. at C169 (reading of Kolbe deposition)). This testimony received somewhat shaky support from plaintiff's expert, Ed Griebe. Mr. Griebe recalled that he had become familiar with Detex about 1970–73. (Tr. at B97).

15. When defining the relevant prior art, it is not the differences or similarities between various arts that are important. Rather the relevant inquiry relates to the relationship between the problem which the inventor of the patent-in-suit was attempting to solve and the problem to which any prior art reference is directed.
*Toro Co. v. Textron, Inc.*, 499 F.Supp. 241, 248 (D.Del.1980) [citation omitted]. *Toro* also recognizes that when a solution exemplified in a nonanalogous art reference is generally known in the mechanical arts at large, then it belongs to the prior art attributed to one ordinarily skilled in mechanics irrespective of its source.
The finding of non-analogy is supported by plaintiff's expert who testified that although he had worked with float switches in the oil business and door-monitoring devices in the security business, he never thought to link the two technologies. Tr. at B88–89.

cluded the Locknetics device is not prior art because all of the evidence of its existence is extremely vague and later than the December 30, 1971 date of reduction to practice of the Stanley concealed switch hinge.[16] Consequently, Locknetics will be excluded from prior art.

■ At trial, the parties agreed that the state of the art regarding the reed switch and magnet combination was represented by an article by Ken Deans, entitled "Matching Magnetics to Reed Switches." (DX M). The article appeared in the May 18, 1972 issue of *Machine Design*, a trade journal. It contains an overview of useful structures of magnets and reed switches with schematic drawings. While useful as background material, the article cannot be regarded as prior art in the technical sense because it post-dated Suska's reduction to practice by six months.[17]

Finally, defendant offers U.S. Patent No. 3,227,838 ("the Hoeppel Patent," issued January 4, 1966) to demonstrate that the feature permitting adjustment of the magnet's distance from the reed switch was old in the art. (PX24). This element of prior art relates only to Suska's adjustment feature as described in claims 8, 9, 10 and 11.

### C. *Anticipation*

The inquiry relating to anticipation under section 102 focuses upon whether the prior art contains an exemplum of the device disclosed by the patent-in-suit. Section 102 principles have been summarized as follows:

> To anticipate a patent, "[a] prior art reference must teach the very invention of the patent," *Tokyo Shibaura Electric Co., Ltd. v. Zenith Radio Corp.*, 404

F.Supp. 547, 558 (D.Del.1975), aff'd, 548 F.2d 88 (3d Cir. 1977); see *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 875 (3d Cir. 1977); *Congoleum Industries, Inc. v. Armstrong Cork Co.*, 339 F.Supp. 1036 (E.D.Pa.1972), aff'd, 510 F.2d 334 (3d Cir.), cert. denied, 421 U.S. 988, 95 S.Ct. 1991, 44 L.Ed.2d 478 (1975), or disclose "a device substantially identical to that claimed under the terms of the patent." *DeLong Corp., supra*, at 1141 (referencing "on sale" bar of § 102). Further, "it must appear that every material element of the claim in question was disclosed by a single prior art reference." *Mueller Brass Co. v. Reading Industries, Inc.*, 352 F.Supp. 1357, 1367 (E.D.Pa.1972), aff'd mem., 485 F.2d 1395 (3d Cir. 1973); accord, *Paeco, Inc., supra*, 562 F.2d at 875. *Grefco, supra*, 499 F.Supp. at 850.

McKinney has argued that Suska's concealed switch hinge was anticipated by the float switches of the U.K. and Sargent patents (PX20 & 21) and by the teachings of the Deans article, specifically figure 1(d). (DX M at p. 130). Defendant maintains that these references disclose the essential elements of claim 1: hinge-like structures in which magnet and switch are related to each other by pivotal movement. Defendant's anticipation argument need not detain the Court since the patents and article relied upon have previously been held not to be prior art.[18]

### D. *Obviousness*

A patent will be held invalid for obviousness

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter

---

**16.** See Tr. at D29–30 (reading of Saphirstein deposition), DX MM (April, 1972 Locknetics price list), DX NN (same), DX OO (February, 1972 drawing).

**17.** Defendant also objected to the article's admission as prior art because defendant failed to give specific notice of reliance on this exhibit as required by 35 U.S.C. § 282. The statute does, however, permit the Court to admit the evidence under such conditions as its discretion recommends. Because defendant's pre-trial pleadings cite the article, although not with specificity, and list it as an exhibit, DX M will be admitted as illustrative of the state of the art but not prior art. See *Skanklin Corp. v. Springfield Photo Mount Co.*, 387 F.Supp. 345 (D.Mass.), aff'd, 521 F.2d 609 (1st Cir. 1975), cert. denied, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *Roller Bearing Co. of America v. Bearing, Inc.*, 322 F.Supp. 703 (E.D. Pa.1971).

**18.** See *supra* at 1106–1107.

as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. In analyzing whether a claimed invention is obvious the beginning point must be the primary criteria set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966):

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

### 1. *The Pertinent Art*

The parties were unable to agree upon what constitutes the pertinent art. Defendant asserts familiarity with hinges and the magnet-reed switch combination sufficiently defines the pertinent art. Plaintiff would narrow the scope of the art by requiring knowledge of security devices as well and further suggests that door-monitoring devices should be the relevant art. (*See* Tr. at B102–103).

The evidence demonstrates that concerns about security were highly relevant to creation of the concealed switch hinge. According to the Suska patent's abstract (PX1 at Col. 1), the concealed switch hinge was conceived to solve the problem of detectability, a security concern. Ed Griebe— plaintiff's expert witness and a security systems consultant with experience in engineering and architectural hardware—testified that concealment and protection of door-monitoring systems had been a major concern prior to the solution achieved by Stanley's hinge. (Tr. at B77).

As a rule, the art pertinent to machines has not been defined so broadly as to require universal knowledge of the applications of known mechanical components, as defendant's definition would do. Rather courts have narrowed the art to focus on the context of the inventor's problem, while avoiding definitions so narrow that they merely describe the use to which the invention has been put rather than the experience from which the invention could be created. *Application of Grout*, 377 F.2d 1019 (C.C.P.A.1967). Two recent cases from the Third Circuit Court of Appeals illustrate its rejection of the too-broad and too-narrow approaches. In *Systematic Tool & Machine Co. v. Walter Kidde & Co.*, 555 F.2d 342 (3d Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 128 (1977), the slicing of tomatoes was found to be an improper definition of the art pertinent to invention of a simple gadget for slicing tomatoes. The court instead looked to the person familiar with the design of food slicing devices. *See also Sims v. Mack Truck Corp.*, 608 F.2d 87, 92–93 (3d Cir. 1979), *cert. denied*, 445 U.S. 930, 100 S.Ct. 1319, 63 L.Ed.2d 764 (1980). On the other hand, in considering the art pertinent to a weight-lifter's chest press machine, the Third Circuit found the general field of mechanical engineering too broad. Instead, it identified design of body-building machines as the pertinent art. *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp.*, 546 F.2d 530, 537 (3d Cir. 1976), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977). *Cf. Howe v. General Motors Corp.*, 401 F.2d 73, 76–78 (7th Cir. 1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1192, 22 L.Ed.2d 452 (1969) (patented car door hinge judged against prior art in automotive hinge field, not hinges in general).

Applying these principles and examples to the present case, the Court finds that the art of door-monitoring systems as urged by plaintiff is so narrow as to violate the rule against defining the pertinent art in terms of the invention's ultimate use. McKinney's broad definition must also be rejected. Problems stemming from security needs

provided the impetus for the invention and the criteria of its success. Since security needs defined the inventor's problem, they cannot be dismissed from the definition of the pertinent art. The pertinent art is defined as the art of designing building intrusion security devices and their associated hardware utilizing basic mechanical and electrical principles.

### 2. *Level of Skill in the Pertinent Art*

█ Patentability depends on whether or not the claimed invention was obvious "to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The hypothetical person is the worker in the industry who is attempting to solve the problems the inventor addressed by means of the patented device. *See Systematic Tool, supra*, 555 F.2d at 348; *Grefco, supra*, 499 F.Supp. at 856. In this case the hypothetical person is one engaged in the art of designing, building intrusion security devices and associated hardware utilizing basic mechanical and electrical principles.

The parties agree that the level of skill demanded by the problem Suska addressed is not a high one. Such familiarity with basic mechanical and electrical principles as might be gained by undergraduate work in engineering or experience in an architectural hardware business would provide the necessary knowledge of the structural elements and functioning of the device. The Court finds that no highly specialized training is required in the case of this straightforward combination patent. *See Sims, supra*, 608 F.2d at 92.

Both inventors, Suska and Gwozdz, and the two technical expert witnesses, Griebe and Brent, qualify to testify on the pertinent art. Mr. Brent admitted that he would not consider himself an expert in the security field. (Tr. at D75–77). However, his engineering education, his expertise in dealing with magnetic switches and his limited experience with one or two security systems convince the Court that his testimony should not be discarded. Having es-

tablished a low requirement of level of skill, the Court will consider Mr. Brent's opinion testimony although it will have less force than contradictory opinions by other experts.

### 3. *Differences Between the Prior Art and the Suska Claims*

Before comparing the prior art with the Suska invention, the Court must define exactly what that invention is. As noted above, it consists of eleven claims.[19] All claims are dependent upon claim 1 which reads:

> 1. A switch activating hinge comprising a pair of adjacent, pivotally connected hinge leaves, a magnet producing a magnetic field mounted on a first hinge leaf, and a magnetically activated switch responsive to the magnet mounted on a second hinge leaf, the switch responding to the magnet when the first hinge leaf is oriented in a predetermined position relative to the second hinge leaf.

PX1 at Col. 7, lines 14–21. As McKinney points out, this independent claim makes no mention of concealment, or of the mounting of switch and magnet on the *back* of the hinges. Plaintiff, on the other hand, argues that a proper reading of the patent as a whole permits the Court to attribute to the invention the aforementioned characteristics even though claim 1 is silent.

█ McKinney correctly states that unclaimed characteristics or results of the invention may not form the basis for a finding of nonobviousness. *See Photo Electronics Corp. v. England*, 581 F.2d 772, 776 (9th Cir. 1978); *Schmidinger v. Welsh*, 383 F.2d 455, 462 (3d Cir. 1967), *cert. denied*, 390 U.S. 946, 88 S.Ct. 1031, 19 L.Ed.2d 1134 (1968). But patent claims may, often must, be interpreted by reference to the drawings and specifications appended. "[I]t is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966).

---

**19.** *See* note 2, *supra.*

See also Philip v. Mayer, Rothkopf Industries, Inc., 635 F.2d 1056, 1061 (2d Cir. 1980); Photo Electronics, supra, 581 F.2d at 776; Schmidinger, supra, 383 F.2d at 460; Catanzaro v. Masco Corp., 423 F.Supp. 415, 431 (D.Del.1976), aff'd, 575 F.2d 1085 (3d Cir.), cert. denied, 439 U.S. 989, 99 S.Ct. 586, 58 L.Ed.2d 662 (1978).

It is concluded the patent contemplates the switch and magnet being mounted behind the hinge's open face. This structure appears from the drawings accompanying the specifications. Further, a patent is a contract "to be interpreted according to the intent of the parties." Catanzaro, supra, 423 F.2d at 431. This Court must view each claim in terms of the primary goal of the invention stated in the specifications, that of concealment.[20] See PX1 at Col. 1. Only rear mounting will effect that goal. Therefore, I conclude that the patent as a whole must be read to claim rear mounting of magnet and switch and each claim must be read as contemplating the magnet and reed switch being mounted on the rear flat surface of the hinge leaves. This reading merely limits claim 1 permissibly. See Roberts Dairy Co. v. United States, 530 F.2d 1342, 1352 (Ct.Cl.1976).

With respect to the general principle of concealment, analysis becomes more subtle. McKinney correctly notes no claim speaks of concealment. Claim 3, however, discloses a method of attaching the switch and magnet so that "the one end of the casing generally defines a continuous plane with a front surface of the hinge leaf." (PX1 at Col. 7, lines 30–31). This method of attachment results in the flat, innocuous face of the hinge, which, in turn, gives rise to concealment of the security device's presence. While Suska's claims cannot monopolize the idea of concealment as an element of the invention, the concealing structure has been formally claimed, effectuates the intent of the invention, and is a part of the invention. For purposes of accuracy and convenience, this feature will be called "the flat surface."

In the final analysis, Stanley's concealed switch hinge may be characterized as a door hinge behind whose flat surfaces are mounted the adjustable magnetic and switch components of a monitoring system. So defined, the Suska invention differs from relevant prior art in that it combines elements individually commonplace, but not before found in one mechanism. The door hinge as carrier of a monitoring device appears in Peterson (PX19). The reed switch/magnet combination was generally known to be capable of use in a pivoting relationship (DX M) and in the context of building security (Takahaski, PX25). More importantly its applicability to door monitoring attachments was shown in Harman (PX22) and Detex (PX23). Placement of switch and magnet behind a flat surface is exemplified by Detex (PX23). Adjustability of magnet vis-a-vis reed switch is taught in Hoeppel (PX24).

The question for decision is this: On December 30, 1971, would a person skilled in the art of designing building intrusion security devices and associated hardware utilizing basic mechanical and electrical principles and deemed to be aware of the prior

---

20. Cf. United States v. Adams, supra, 383 U.S. at 48–49, 86 S.Ct. at 712–713 (although main claim did not mention use of water electrolyte in patented battery, invention could be inferred to use water since subsidiary claims mention it and patentee's stated objective was to make water-activated battery).

Defendant has cited the "doctrine of claim differentiation" by which it has been held that "the presence of narrow claims, . . . is evidence that limitations are not to be written into the broader claim." Duplan Corp. v. Deering Milliken, Inc., 444 F.Supp. 648, 710 (D.S.C.1977) (citation omitted), aff'd in part & rev'd in part on other grounds, 594 F.2d 979 (4th Cir. 1979),

cert. denied sub nom. Ateliers Roannais de Construction Textile v. Duplan Corp., 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980). With regard to rear mounting, this Court finds that relegation of description of a rear mounting to the narrow claim 3 does not prevent "writing it into" claim 1. With the explicit evidence of intent to conceal, the inferential evidence derived through claim differentiation is overwhelmed. The doctrine of claim differentiation is not destroyed by this reading. Because claim 3 describes not only the place of mounting, but the precise means of attachment, it remains narrower than claim 1.

art, have found it obvious to replace Peterson's mechanical switch with a magnet-reed switch combination, or Detex' recessing of the magnet-reed switch covered by flat metal surfaces, with a functional hinge?

A court addressing the above question must start with the Patent Office's negative answer. Although Harman and Peterson were discussed in Suska's specifications, the patent was granted.[21] Consequently plaintiff may invoke the statutory presumption of patent validity and defendant will have the burden of overcoming it by clear and convincing evidence. 35 U.S.C. § 282. *See Aluminum Co. of America v. Amerola Products Corp.*, 552 F.2d 1020, 1024 (3d Cir. 1977); *Tokyo Shibaura Electric Co. v. Zenith Radio Corp.*, 548 F.2d 88, 93 (3d Cir. 1977); *Grefco, supra*, 499 F.2d at 847.

The patent application does not, in so many words disclose the Detex device. McKinney argues that this gap in the patent examiner's knowledge of the prior art substantially weakens the presumption of validity. *See Aluminum Co., supra*, 552 F.2d at 1024; *PIC Inc. v. Prescon Corp.*, 485 F.Supp. 1302, 1312 (D.Del.1980); *Azoplate Corp. v. Silverlith, Inc.*, 367 F.Supp. 711, 717 (D.Del.1973), *aff'd mem.*, 506 F.2d 1050 (3d Cir. 1974), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975). Stanley disputes the proposition, arguing that Detex principles are revealed in the general description of the Harman device provided in the Background section of the Suska specifications. That description reads:

One monitoring device known in the art utilizes a magnetically operated switch. The switch is mounted *on* a jamb above a door and a magnet is mounted *on* the upper edge of the door. The switch is either normally open or normally closed and assumes the opposite position in response to the magnet when it and the magnet are in closely spaced relation, as when the door is closed.

PX1 at Col. 1, lines 17–24 [emphasis added]. Detex does not fit within this description. Such broad language is not adequate, as a practical matter, to convey the special characteristic of Detex that renders it more relevant than Harman, *viz.*, the use of flat, metal plates to cover the magnet and reed switch which are recessed *in* the door and jamb as opposed to being *on* the jamb and door. As a consequence the presumption of validity is weakened.[22]

The intrinsic evidence of the prior art convincingly demonstrates the obviousness of Suska's device. Not only does the prior art disclose all of the elements used in the patent-in-suit, Detex also teaches installing the monitoring elements recessed into the door and jamb behind flat plates to ameliorate the open vulnerability of Harman-type devices. With the contribution of Peterson, the concept of using hinge plates to carry a monitoring device completes virtually all of the steps toward the concealed switch hinge. The final step requires only the perception that the flat plates of the hinge, already known to be useable for security devices, can replace the flat plates of Detex, or that the magnet/switch combination of Detex could be substituted for Peterson's plunger switch to achieve undetectability. Either of these perceptions would readily occur to the hypothetical person skilled in

21. *See* PX1. Harman and Peterson appear as relevant references on the first page of the patent. Their salient features and drawbacks are discussed in the patent specifications at Col. 1, lines 17–26 (Harman), and Col. 4, lines 53–55 (Peterson).

22. McKinney contends that Stanley's failure to provide the Patent Office with information about the Detex device (PX23) and the Deans article (DX M) opens Stanley to a charge of fraud on the Patent Office. The Court cannot agree. As this Court held in *Grefco*, either bad faith or "gross negligence" may be a basis for finding fraud. 499 F.Supp. at 860. DX M bears a date of May 18, 1972. The copy of Detex instruction sheets taken from Stanley's file accompanied a memo dated May 8, 1972. Since Stanley has successfully claimed an earlier date of invention, the failure to disclose information dated after the invention does not support an inference of bad faith. The "gross negligence" alleged is simply the failure to find a copy of the Detex flyer which reposed in a salesman's files and to note that, although received by Stanley in 1972, it bore a copyright date of 1970 in small print. This is not reckless indifference to the duty of candor owed to the Patent Office.

the pertinent art especially where interest was focused upon complete concealment of the monitoring device.

■ It is true that this is not a case in which recombination of old elements produces no new result. The function of complete concealment is new to the hinge, not explicitly taught by the prior art.[23] However, the Third Circuit Court of Appeals has found that an improvement in prior solutions to a known problem is not an invention, but the product of an ordinary mechanic's skills when that improvement logically follows from the characteristics of the old elements. *Northern Engineering & Plastics Co. v. Eddy*, 652 F.2d 333 (3d Cir. 1981). In this case the effect of improved concealment logically follows from the opaque nature of the hinge plates. It may be said of Suska, as the Court of Appeals said in *Eddy*, that, "rearrangement of the 'old' elements produced no unanticipated result." Instead, the concealed switch hinge is easily "deduced, from the rather simple and totally geometrical properties" of a hinge. *Id.*, at 339. *See also Tokyo Shibaura, supra*, 548 F.2d at 92–94 (proper to reason that skilled television technician would obviously solve color contrast problem by one prior art means, perceive the diminution of brightness created by the first solution, and resolve that problem by means suggested in a second prior art patent); *Timely Products Corp. v. Arron*, 523 F.2d 288, 294 (2d Cir. 1975).

The Court is well aware that most combination inventions can be rendered obvious by the perfect logic of hindsight. *See, e. g., Rengo, supra*, at 545; *Tokyo Shibaura, supra*, 548 F.2d at 94. Nevertheless, it is entirely permissible to impute to the ordinary skilled mechanic a certain amount of foresight. In attempting to solve the problem posed, he can be expected to deduce a natural consequence from the apparent qualities of devices with which he works. *Johnson & Johnson v. W. L. Gore & Assoc.*, 436 F.Supp. 704, 723–24 (D.Del.1977). In concluding that a person possessed of ordinary skill in the art of designing building intrusion security devices and their associated hardware utilizing basic mechanical and electrical principles would reason from Peterson and Detex to the claims in suit, the Court merely attributes to the hypothetical person the ability to observe the apparent characteristics of the prior art devices of which he is deemed aware, and apply them to the problem of concealment. Suska's concealed switch hinge is but the logical extension of prior art; it is the fruit of its time not of innovative genius. It is held that mounting the magnet/switch combination behind the hinge leaves was obvious within the meaning of 35 U.S.C. § 103. As a consequence, independent claim 1 is invalid.[24]

---

23. Patentable innovation may possibly be found when old elements are combined to yield a nonobvious result greater than the collective functions of the parts. *See Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *Sims, supra*, 608 F.2d at 92; *Grefco, supra*, 499 F.2d at 858–59. Plaintiffs' contend that such a "synergistic" effect is produced by the Suska patent. The Court agrees that the requirements for synergism have been met. In the Suska device, all the parts—hinge, magnet and reed switch—perform their usual function, but the hinge has the new function of concealing the existence of a security device. This reasoning has no effect on the conclusion of obviousness. Quite recently—in fact, after oral argument in this case—the Third Circuit held that *Sakraida* and *Anderson's-Black Rock* do not replace or supplement the primary *Graham* test for section 103 obviousness. The proper inquiry is whether the selection of known elements to obtain the new result was obvious. *Rengo Co. v. Molins Machine Co.*, 657 F.2d 535 at 545 (3d Cir. 1981). Because this combination itself with its foreordained result of concealment was obvious under § 103, the synergistic effect cannot validate the patent. ......

24. *Graham* permits consideration of secondary considerations bearing on obviousness, such as "commercial success, long felt but unsolved needs, failure of others, etc." *Graham, supra*, 383 U.S. at 17, 86 S.Ct. at 694. These factors cannot overcome a finding of obviousness based on the primary *Graham* tests and therefore will not be discussed. *See, e. g., Tokyo Shibaura, supra*, 548 F.2d at 95; *Continental Can Co. v. Crown Cork & Seal Co.*, 415 F.2d 601, 602 (3d Cir. 1969); *cert. denied*, 397 U.S.

All other remaining claims in litigation, 2, 6, 7, 8, 9 and 11, are dependent upon claim 1.[25] To the extent they are dependent upon claim 1 they are also invalid. More particularly, independent claim 2 specifying the face-to-face relationship of the hinge leaves in the switch activating position, dependent claim 6 merely calling for mounting the hinge on the door and dependent claim 7 describing the operation of the magnet-reed switch combination are derived from prior art and obvious within the meaning of 35 U.S.C. § 103. Dependent claims 8, 9 and 11 all relate to the adjustability of the magnet relative to the reed switch. The desirability and prior use of such an adjustability feature was conventional and necessary. Tr. at B29 (Suska); Tr. at D103–109, 123–127 (Brent). Moreover, the specific means of adjustment had been disclosed in Hoeppel (Ex. 24). More importantly, plaintiff did not contend that either the feature or specific means of adjustment of the magnet was patentable as generally used in magnet-reed switches. Rather, uniqueness was attributed to use of the adjustment mechanism when the magnet-reed switch is combined with a hinge.[26] Having previously held mounting the magnet reed-switch behind the hinge leaves is not patentable by reason of obviousness, it necessarily follows that dependent claims 8, 9 and 11 are invalid as being obvious under 35 U.S.C. § 103.[27]

■ In accordance with this Opinion, an Order will be entered holding claims 1, 2, 6, 7, 8, 9 and 11 of United States Patent No. 3,806,852 invalid under 35 U.S.C. § 103.[28]

914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970); *Grefco, supra,* 499 F.Supp. at 857.

25. Claim 8 is dependent upon claim 1. Claim 9 is dependent upon claim 8 and claim 11 is dependent upon claim 9. It follows claims 8, 9, and 11 are ultimately dependent upon claim 1.

26. THE COURT: Just help me out. What is the purpose of this particular piece of evidence you are going into?

MR. COPLEIN: Yes, sir, your Honor, very simple. The purpose of this particular piece of evidence is as follows: That Claim 1 is a broad claim, and with Claim 1 I have to cite prior art to show that every element is anticipated or unobvious, or would have been obvious to a person of ordinary skill in the art. And we have got some prior art which we think carries that burden.

When I get down to Claims 8, 9 and 11, those added the feature to the basic structure of making the magnet adjustable. And Hoeppel is to show that it would have been obvious to a person of ordinary skill in the art at the time, as shown by the Hoeppel patent in 1966, that you move these magnets back and forth and adjust it.

THE COURT: Let's find out if that is contested. Is that contested?

MR. FORD: Your Honor, it is not contested that in this type of other switch it was common to do that. However, in this combination it was not....

Tr. at D108–09.

27. Dependent claims 3, 4, 5 and 10, not having been litigated, are entitled to retain their presumption of validity under 35 U.S.C. § 282. While defendant apparently asserted these claims were invalid in its answer and counter-claim, it proffered evidence and proposed conclusions of law relating only to claims 1, 2, 6, 7, 8, 9 and 11. *See* Pretrial Order, Doc. 38, Appendix B at 22 and defendant's Post-Trial Brief at 28–29, Doc. No. 59.

28. Infringement issues encompassing, *inter alia,* complex claim interpretation, literal infringement, file wrapper history, and the interface of the doctrine of file wrapper estoppel and the doctrine of equivalents in a simple factual context, but where the law is not clear, have not been addressed. In declining to appreciably lengthen this opinion with pure dicta, the Court is not unaware of the appellate court's past expressed preference that the district court proceed to determine infringement notwithstanding its conclusion that the patent is invalid. *See Frank W. Egan & Co. v. Modern Plastic Mach. Corp.,* 387 F.2d 319 (3d Cir. 1968). Rather, in these days of crowded dockets the Court follows the lead of the Third Circuit Court of Appeals in avoiding "unnecessary resolution of a difficult and complex question(s)" presented by the infringement issue. *Rengo, supra,* slip op. at 35. If, on appeal, this Court should be affirmed, there would have been no need to reach the numerous infringement issues; if the Court should be reversed, there will most likely be a remand to afford this Court an opportunity to consider the additional guidance provided by the appellate court. *Cf. Rengo.* At that time, if required, dutiful consideration could be given to the infringement issues. Only if there is a reversal with a directive to enter a judgment of validity will this Court by not determining infringement have caused a possible unnecessary piece-meal appeal.